1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - X
                        :
IN RE: ZYPREXA LITIGATION,

                            04-MD-1596

                        :
- - - - - - - - - - - - -X    United States Courthouse

                              Brooklyn, New York

                              June 15, 2004
                              11:30 o'clock a.m.


        TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
        BEFORE THE HONORABLE JACK B. WEINSTEIN
        UNITED STATES DISTRICT JUDGE
        and MAGISTRATE JUDGE A. SIMON CHREIN, U.S.D.C.



APPEARANCES:


                    MILBERG WEISS
                    One Pennsylvania Plaza
                    New York, NY 10119
                    BY:  MELVYN I. WEISS, ESQ.
                         MITHCELL M. BREIT, ESQ.


                    MICHAEL LONDON, ESQ.


                    SEEGER WEISS LLP
                    One William Street
                    New York, Newyork 10004-2502
                    BY:  CHRISTOPHER A. SEEGER, ESQ.
                         SETH A. KATZ, ESQ.

2

RICHARDS, PATRICK WESTBROOK
         & BRICKMAN, LLC.
1037 Chuck Dawley Blvd., Bldg. A.
Post Office Box 1007
Mt. Pleasant, S.C. 29464
BY:  THOMAS ROGERS, ESQ.
     H. BLAIR HAHN, ESQ.


ASHCRAFT & GEREL, LLP.
4900 Seminary Road, Suite 650
Alexandria, Va. 22311
BY:  MICHAEL W. HEAVISIDE, ESQ.
     TIM GREEN, ESQ.
     CHRIS TISI, ESQ.


MORGAN SEXTON & BERRY, LLC.
175 East Main Street, Suite 300
Lexington, Kentucky 40507
BY:  JUSTIN R. MORGAN, ESQ.


LOPEZ, HODES, RESTAINO, MILMAN
& SKIKOS
450 Newport Center Dr. 2nd Floor
Newport Beach, Ca. 92660
BY:  RAMON ROSSI LOPEZ, ESQ.


LOPEZ, HODES, RESTAINO, MILMAN
& SKIKOS
625 Market St., 11th Floor
San Francisco, Ca. 94105
BY:  MARK G. CRAWFORD, ESQ.


WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A.
1513 Central Trust Tower
Cincinnati, Ohio 45202
BY:  TERRENCE L. GOODMAN


BURG SIMPSON ELDREDGE HERSH
JARDINE, P.C.
40 Inverness Drive East
Englewood, Co. 80112
BY:  MICHAEL S. BURG, ESQ.

1        PETER W. BURG, ESQ.

2

3        HERSH and HERSH
         2080 Opera Plaza
4        601 Van Ness Avenue
         San Francisco, Ca. 94102-6388
5        BY:   NANCY HERSH, ESQ.
         BERNE REUBEN, ESQ.
6        RACHEL ABRAMS, ESQ.
         MICHAEL E. BURTON, JR., ESQ.
         AMY ESKIN, ESQ.
7

8        ROBINSON, CALCAGNIE & ROBINSON
         NEWPORT BEACH OFFICE
9        620 Newport Center Drive
         Seventh Floor
10       Newport Beach, California 92660
         BY:  MARK P.ROBINSON, JR.
11       CARLOS A. PRIETTO, III

12

13       LEVIN-PAPANTONIO-THOMAS-MITCHELL
         ECHSNER & PROCTOR P.A.
14       P.O. BOX 12308, Suite 600
         Pensacola, fl.  32501
15       BY:  TROY A. RAFFERTY, ESQ.
         MEGHAN M. TANS, ESQ.

16

17       SANDERS, TISMO & ASSOCIATES
         1017 Russell street
18       Covington, Ky.  41011
         BY:  ROBERT E. SANDERS, ESQ.

19

20

21       PEPPER HAMILTON, LLP.
         Eighteenth and Arch Streets
22       Philadelphia, Pa. 19103-2799
         BY:  ANDREW R. ROGOFF, ESQ.
23       ANTHONY VALE, ESQ.
         ALINE FAIRWEATHER, ESQ.
24       ANDREW E. KANTRA, ESQ.

25

4

1      ULMER BERNE LLP.
       Forest Pharmaceuticals, Inc.
2      and Forest Laboratories, Inc.
       600 Vine Streetl
3      Suite 2800
       Cincinnati, Ohio 45202-2409
4      BY:  JENNIFER SNYDER HEIS, ESQ.

5
       McCARTER & ENGLISH
6      For:  Eli Lily
       245 Park Avenue
7      New York, New York  10167
       BY: SAMUEL J. ABATE, JR.

8

9  APPEARING VIA TELEPHONE:    JOHN ROACH, ESQ.

10                             CORRINNE BROMFIELD, ESQ.

11                             RICHARD STUHR, ESQ.

12                             DIANE NAUST, ESQ.

13                             DANA TASCHNER, ESQ.

14

15  Court Reporter:        Marsha Diamond
16                         225 Cadman Plaza East
                           Brooklyn, New York
17                         718-330-7687

18

19

20  Proceedings recorded by mechanical stenography, transcript
    produced by computer.
21

22

23

24

25

5

1      THE CLERK: Civil cause for status conference:  IN

2 RE: ZYPREXA LITIGATION

3      Docket No.  04-MD-1596.

4      (Magistrate Judge Chrein also present)

5      THE COURT:  Good morning, everybody.  What a

6 pleasant thing having so many distinguished lawyers coming all

7 the way to Brooklyn to see Magistrate Judge Chrein. Please be

8 seated.

9      THE CLERK:  People on the telephone, would you note

10 your appearance, please.

11      MR. WEISS:  Your Honor.

12      THE COURT: Wait.  We are going to get the telephone.

13      MR. WEISS:  Can we request that they state which

14 cases they are associated with?

15      THE COURT:  Yes.  State the case you are associated

16 with, please.

17      THE CLERK: Counsel on the telephone, note your

18 appearances?

19      MR. ROACH:  John Roach.  I am counsel for

20 Dr.  Hodack in the case Philips versus Rogue County and other

21 districts.

22      THE CLERK: Mr. Roach, can you try that again please?

23      MR. ROACH: I am counsel for Doctor Thomas Bodeha of

24 Philip versus Bodeha in the Eastern District of Tennessee.

25      MS. BROMFIELD:  Corinne Bromfield, counsel for Igor

1   Mazure (ph) Psychiatric Associates of Chesapeake.  This is a

2   case pending in the City of Portsmouth, Virginia.

3           THE CLERK: Mr. Stuhr.

4           MR. STUHR: My name is Richard Stuhr, Colombus, Ohio.

5   I represent David Ferris, D.O, and we are at Medical Center in

6   the Olenock versus Eli Lily, et al matter.

7           THE CLERK: Mr. Taschner?

8           MR. TASCHNER:  Dana Taschner.  Jack Powell, District

9   of California, Central District of California.

10          MS. NAUST: Diane Naust, Pennsylvania, of counsel

11  with Mr.  Chesley.  I believe Mr. Chesley's partner

12  Mr. Goodman is in the courtroom.  We are counsel for a number

13  of plaintiffs in cases to be filed in the Eastern District of

14  Pennsylvania or if we think it appropriate, directly in

15  Brooklyn.

16          THE COURT:  Is that it?

17          THE CLERK: Yes, Judge.

18          THE COURT:  All right. I take it all the other

19  counsel have or will give their appearances to the reporter

20  and since there are so many here, if you would give us your

21  name when you talk. I think probably the first matter of

22  business is the pending motion in Folse v. Eli Lily, motion to

23  amend and remand.  You can either stay or come up, whichever

24  you prefer.

25          MR. MOUTON:  Okay. For the record, Benjamin Mouton

1    from Baton Rouge, Louisiana on behalf of the plaintiffs in the

2    Folse case F-O-L-S-E transferred here from the Western

3    District of Louisiana. Your Honor, both my motion to amend for

4    leave of court to amend to add the treating psychiatrist in

5    Louisiana, Dr. Edgardo Concepcione and his liability insured

6    medical protective company, we filed that on March 5th, which

7    I think was before -- certainly before the MDL transfer order

8    came out, but I think before, we also argued it as well, which

9    was later in March. I follow-up our argument at MDL with a

10   motion to remand which was filed March 29th. Essentially, we

11   are trying to add Dr. Concepcione to the case as a part of the

12   defendant. The record establishes that he is a resident of

13   Louisiana, practicing physician there, and he once added would

14   destroy diversity.  I think the defendants jointly are

15   objecting to that alleging fraudulent joinder.  We briefed the

16   issue both in terms of obtaining leave of court to amend the

17   pleadings to add him and to remand the case because of the

18   jurisdictional defect after he's added to the case.

19           When we filed the motions, obviously, they were

20   pending before Judge Rebecca Dogherty in Louisiana. She is

21   familiar with the Louisiana statute on the medical review

22   panels and I do have a copy of that for you and your staff if

23   you need it. Primarily, I want the Court to understand that

24   this is a joinder of Dr. Concepcione, that procedurally we had

25   to wait to bring him into the case because of the fact that

1   Louisiana has a medical review panel proceeding for physicians

2   that are qualified under the Louisiana Medical Malpractice

3   Act. If we could have named him originally we would have, but

4   we had to go through that procedural process before filing

5   suit.

6          The proceedings before the medical review panel were

7   completed in late January. We added him or attempted to add

8   him through the motion for leave in early March, well within

9   the statutory requirement to do so, within 90 days of the

10  opinion the defendants objected to -- I initially filed the

11  motion for leave seeking ex parte.  Generally that is not

12  objected to but it was in this case, by both defendants, which

13  made it necessary to follow that up with a motion to remand.

14         We cited to the Court the factors in the Hensler

15  case, the Fifth Circuit case, that lays out the recognized

16  factors for remand of a case.  Dr. Concepcione was a treating

17  physician. He prescribed both Zyprexa and Celexa and I would

18  point out for the Court's benefit our case is somewhat

19  different -- very much so different from the other Zprexa

20  cases involved in this MDL because it doesn't involve

21  allegations of diabetes or diabetic related conditions, but in

22  fact, deals with a drug-drug interaction between Zyprexa and

23  Celexa resulting in the death of Mr. Kevin Folse, and so

24  because it involves prescribing two drugs diagnosing

25  psychiatric conditions, or what was believed to be psychiatric

1   conditions as a predicate to the prescribing those
2   medications, we feel that he's an indispensable party, we have
3   experts lined up on both elements of the case to proceed. We
4   don't want to get caught in the situation where the case
5   proceeds in the federal forum against the drug companies where
6   they're pointing the begin finger at Dr. Concepcione for doing
7   something he shouldn't have done and vice versa, and I think
8   it also important to note that both defendants -- both drug
9   company defendants have raised the learned intermediary
10  defense in this case which I think clearly implicates what
11  Dr. Concepcione did, what he was thinking, and the actions and
12  omissions that he committed while he was caring for Mr. Folse.
13  So with all of that, we submit to you that this case first
14  should -- we should be allowed to amend the petition to add
15  Dr. Concepcione.  The first supplemental amended petition was
16  received in the Lafayette but was never filed, but once that
17  is filed, also grant our motion to remand and to have this
18  case sent back to the state court 15th judicial district in
19  Lafayette, Louisiana.
20          THE COURT:  What was the results of the medical
21  panel inquiry.
22          MR. MOUTON:  The three psychiatrists found no breach
23  of the standard of care.  However, they focused in on the
24  question of whether it was appropriate or not to prescribe
25  Zyprexa and Celexa based on the information that was known at

10

1   the time. Our expert is also addressing the issues of whether

2   Zyprexa should have been prescribed at all to this patient.

3   Obviously, if it was malpractice to put him on Zyprexa, I

4   think clearly everyone understands in this case this is was an

5   off label usage of the drugs because he was not schizophrenic,

6   and he was not manic. And so, some of the recommendations made

7   by the manufacturer were not followed by Dr. Concepcione on

8   the front end.  So, in September if he had not been on

9   Zyprexa, even if he needed Celexa for some depressive

10  disorder, we wouldn't have had a drug to drug interaction, so

11  we are looking at from the beginning of care in January of

12  20002 all the way to September when he died 19 days after the

13  two drugs were mixed and proscribed together. We don't allege

14  any problems, really, with the drug, prescribing of the drug

15  or taking of the drug up until the time that it was combined

16  with Celexa in our particular case.

17          THE COURT: And there is no diabetes or related

18  syndrome?

19          MR. MOUTON: No, sir.  Not in our case.

20          THE COURT:  What was the cause of death?

21          MR.  MOUTON:  It was determined that he had a

22  overdose -- high level of above therapeutic of Olanzapine,

23  which is the generic for Zyprexa, which resulted in the

24  respiratory failure and death.

25          THE COURT:  I see.  Thank you.

11

1    MR. ROOGOFF:  Andrew Rogoff, Eli Lily and Company.

2    Mr. Heis will make the argument for our codefendant Forest.

3    First, to address the arguments that Mr. Mouton made at the

4    end, a lot of these arguments were made at MDL panel as to why

5    the case should not be put in the MDL and the Court rejected

6    those arguments about this case not having diabetes or

7    whatever other factors plaintiff has raised. The case is

8    properly here in the MDL and the only issue before Your Honor

9    is whether to allow the amendment of the complaint and to

10   remand to state court. Lily and Forest timely removed the

11   case.

12        THE COURT:  Well, there is no question about that

13   and the only problem that I see at the motion level is whether

14   the discovery as to most of the cases referred here under MDL

15   or in the state related cases raise the same scientific

16   problems as are raised in this case.

17        MR. ROGOFF:  Your Honor, that is an argument that

18   was made in front of the MDL panel and we pointed out in

19   Mr. Mouton's response to our MDL petition, plaintiff said we

20   want to discover Zyprexa from the beginning of time to the end

21   of time.  We want to do all of the same discovery against Lily

22   that all the other plaintiffs are seeking, and that I believe

23   is why the MDL panel sent it here, but that is not the issue

24   on the motion to amend or the motion to remand the case to

25   state court. The case is governed, as Mr. Mouton said, by the

12

1   Hinsler's case, which gives this Court the discretion to deny

2   the motion to amend.

3           THE COURT: I know that. I understand that I have

4   full discretion here, but what is the point of keeping the

5   case here if the whole thrust of discovery on the scientific

6   issues in this particular case is different from that in the

7   other cases?

8           MR. ROGOFF: First of all, not all the cases here are

9   diabetes cases.  There are many different facets to the cases

10  as you will hear from the plaintiffs' counsel.  This may be

11  the only drug interaction case today, but what plaintiffs are

12  seeking is the same discovery that the other plaintiffs are

13  seeking in these cases from the discovery of the molecule

14  through the marketing, and the use of this drug by the

15  psychiatrist.  Discovery has begun in this case.  We have

16  taken individual discovery without Dr. Concepcione in the

17  case, and I think as a matter of judicial economy, there is

18  every reason to keep this case here to maintain the same

19  discovery, so we are not forced into different forums.

20          THE COURT:  I understand that. If there is a

21  substantial overlap of discovery, I will keep the case, and

22  you are telling me there is.

23          MR. ROGOFF:  I am telling you, Your Honor, what was

24  in Mr. Mouton's response to our MDL motion, which was I want

25  to take discovery of the creation of Zyprexa, the marketing of

13

1  it, and everything related to it from the beginning of time.

2  That is what the MDL panel responded to in its transfer order.

3      MR. MOUTON:  One of the points I tried to make to

4  the MDL panel and that I will make here is that Eli Lily and

5  Forest wanted to talk about the judicial economy and fairness

6  to them.  As I understand it, they don't want their employees

7  to be deposed in every case.  They want to do it once, so that

8  everybody can participate. The problem is that because my case

9  is so different, it is going to be hard for me to rely on

10  other plaintiff's counsel to be looking out for my client's

11  interest. I mean I can't be all over the country.  I have

12  other cases. So the issues that I have I can't give over to

13  someone else.

14      THE COURT: But you can give them questions of

15  particular import to your case. If there is some overlap, you

16  certainly are going to want to consider the degree of research

17  they did, and the degree of advertising that they were

18  involved with, what they did in inducing doctors to use this,

19  etcetera. There's overlap.

20      MR.  MOUTON:  There is general overlap but as soon

21  as we get beyond the basic discovery and that information

22  contained therein we are going to go down separate paths.

23      THE COURT:  Well, that may well be but if there is

24  substantial overlap I am not going to let you out.

25      MR.  MOUTON:  With all due respect, Your Honor, I

14

1  don't think there is substantial overlap and I thought the

2  issue here was whether or not there was a fraudulent joinder

3  because I think there are 13 state cases.

4          THE COURT:  That is not the issue before me. I

5  wouldn't think you were guilty of any fraud. You have an

6  affidavit type face. There is no fraud here, but the motion to

7  amend is denied because I think that the case will go forward

8  more expeditiously if you are in.  The motion to amend being

9  denied, the motion to remand is denied.  You can renew it

10 later when you think you have enough information.

11         MR. MOUTON: Your Honor, with all due respect, I need

12 Dr. Concepcione in the case.  The motion to remand is

13 basically whether it stays in federal court.

14         THE COURT:  You can sue him individually in the

15 state.

16         MR.  MOUTON:  I have because I had to.

17         THE COURT:  You have him.  Hold on to him.

18         MR.  MOUTON:  Okay. Thank you

19         THE COURT:  That covers that problem.

20         I think the next issue is a case management problem.

21 The plaintiffs have a proposal, counsel.

22         MR. WEISS:  Yes.  Good afternoon, Your Honor. Melvyn

23 Weiss from Milberg Weiss. First time I am appearing in this

24 court. Your Honor, we spent a fair amount of time, as a matter

25 of fact a lot of time, trying to organize this case, and I

15

1  think we succeeded in yeoman's fashion. There is somebody on

2  the phone who you were unaware of we so couldn't invite in Ms.

3  Naust  or Mr. Chesley to these meetings because we didn't know

4  that they existed.

5       THE COURT:  You knew Chesley existed.

6       MR. WEISS:  We know Chesley and I know Ms. Naust.

7       THE COURT: We all know them.

8       MR. WEISS:  Indeed, for many, many years, many

9  decades, but in any event, save for Ms. Naust and Chesley, we

10 contacted more than 50 law firms involved in these  cases.

11      THE COURT:  Well, let's hear from them.  Do you have

12 any objection?  Do they have your papers?

13      MR. WEISS:  I don't know because we didn't know they

14 existed.

15      MR. GOODMAN; Terry Goodman from the Chesley law

16 firm.  To the best of my knowledge, I have not seen those

17 papers.  I am not familiar with whether Ms. Naust has seen

18 them or not.

19      THE COURT:  You have not seen them?

20      MR. GOODMAN:  I have not seen them.

21      THE COURT: Well, now you can send them the papers

22 and if they have any objection to what you've arranged,

23 they'll let you know, and in due course, either you will make

24 arrangements to bring them within the fold, or they will make

25 a motion themselves.

*MARSHA DIAMOND, C.S.R.*
*OFFICIAL COURT REPORTER*

1          MR. WEISS:  As I understand what Ms. Naust said, she

2     said that there is no case now pending.

3          THE COURT: Yes.  Well, on the telephone, is that

4     satisfactory?  I don't see that.

5          MS. NAUST:  I am having trouble hearing but what I

6     heard you say, Your Honor, was we would come in the fold to

7     make a motion, and that's fine.

8          THE COURT:  So you will get in touch and they will

9     furnish you with all the papers and if you are not satisfied,

10     you will come into court and make your feelings known.

11          MS. NAUST:  Yes. Thank you.

12          THE COURT:  Same thing is true of the Chesley firm.

13          MR. GOODMAN:  That is correct, Your Honor.

14          THE COURT:  That is fine.  Proceed please.

15          MR. WEISS:  In any event, we submitted a proposed

16     case management order that the defendants have already

17     accepted as acceptable to them, and we just need Your Honor's

18     view and approval. Essentially, it sets up a plaintiffs'

19     steering committee with myself as chair and Mr. Seeger to my

20     right as the plaintiffs' liaison counsel.  Mr. Seeger is with

21     Siegel Weiss here in Manhattan at One William Street and we

22     listed the names of those who would be on the committee.  They

23     include several law firms with whom Your Honor has had many

24     cases with, including Perry Weitz and Mark Robinson, Ramone

25     Lopez from California. Essentially, Your Honor, to our

17

1    knowledge, virtually every case with maybe one or two

2    exceptions in the United States is going to be covered by the

3    lawyers that we propose to be on the plaintiffs' steering

4    committee. It is a rare occasion in these kinds of cases for

5    us to have gotten virtually unanimity in how long we are going

6    to run these cases. I think it will make it much more

7    efficient for the Court and we've had many discussions with

8    the defense lawyers on future discovery and we are still in

9    the process of doing that. Clearly, we learn were not

10   empowered to act with any finality given the fact that Your

11   Honor had not yet appointed us, but our discussions with

12   Ms. Gussack from  Hamilton who is here in court indicates that

13   she is very willing to engage in intensive amount of

14   discussion concerning discovery as is necessary.

15            Mr. Lopez has had his cases pending for 11 months.

16   He is somewhat frustrated and champing at the bit to get --

17            THE COURT:  Let's hold that for just a minute.

18            MR. WEISS:  Yes.  Sure.

19            THE COURT:  Mr. Taschner is on the phone, he's

20   interested in being on the steering committee; is that right,

21   Mr. Taschner?

22            MR. TASCHNER:  Your Honor, this is Dana Taschner.  I

23   have not seen the papers.

24            THE COURT: Well, why don't they send you the papers

25   and you can get in touch with members of the committee and

18

1    handle it the way those other two attorneys are handling it.

2           MR. WEISS:  I am sorry.  I'm a little confused

3    because I thought I heard him say that he represented the

4    defendant.  Can we get that clarified?

5           THE COURT:  Are you a defendant representative,

6    Mr. Taschner?

7           MR. TASCHNER:  No, plaintiff, Your Honor.

8           MR. WEISS:  Okay.

9           THE COURT:  All right. Well, they will be in touch

10   with you and if possible it will be resolved amicably. I take

11   it, then, that the defendants are not objecting to the

12   proposed case management order number one?

13          MR. GUSSACK:  No, Your Honor.  Nina Gussack, for

14   defendant Elil Lily.  We are not opposed, Your Honor.  We have

15   been given a copy and have spoken with counsel.

16          THE COURT:  All right. Subject to amendment. Now,

17   the only change I suggest is on the third line.  It says here

18   these cases are hereby consolidated for all purposes.

19   Shouldn't that be for pretrial purposes?

20          MR. WEISS:  Yes, Your Honor.

21          THE COURT: So with that change I will sign it and I

22   will add beneath my signature, "this order is subject to

23   change on motion of any party or on the Court's own motion."

24   Any objection to that?

25          MR. WEISS:  No, Your Honor.

19

1        THE COURT:  Then I will just initial it.

2        MS. GUSSACK:  May I seek a point of clarification?

3   Does Mr. Taschner have a filed case?

4        THE COURT:  Mr. Taschner, do you have a filed case?

5        MR. TASCHNER:  No, I do not, Your Honor. I am just

6   hearing what Mr. Weiss was saying.  My concern is to have

7   somebody from a central district representative on the

8   plaintiffs' steering committee and I understand Ramone Lopez

9   is going to be on the committee which I would support,

10  Your Honor.

11       THE COURT:  Well, you work that out. I don't want to

12  get involved with that kind of detail. The clerk of the court

13  will file and docket.

14       Now, I suppose we ought to move to the first

15  discovery issue. We have a pending state case in California

16  where, at least in terms of papers filed, it is suggested that

17  it would be useful to go ahead and use those filed papers and

18  proposals as a basis for discovery in the case as a whole. Who

19  is representing that case?  Do you want to talk or do you want

20  the counsel for the group to talk?

21       MR. LOPEZ:  Ramone Lopez.

22       There are, I believe, two issues.

23       THE COURT:  Give your name.

24       MR. LOPEZ: Ramone Lopez representing Mr. Rodriguez

25  in the California state court action as well as the plaintiffs

20

1    issues, I think Mr. Weiss and Mr. Seigel will address the

2    issue of adoption of our discovery, and I am prepared to

3    discuss with the Court the process of that.  We have been

4    through for the last ten and a half months since -- actually

5    served 11 months ago and we had a meeting  conferring, we have

6    done with the same 70 lawyers to try to get the documents

7    produced, and the fact that we have a motion to compel pending

8    in front of the state court judge in California who is

9    willing, by the way, to cooperate with this process, and we

10   had a hearing last week and I was able to convince him that

11   while he waited to see what was going to happen here, that we

12   ought not forget about the last ten months of us trying to get

13   them to produce documents and answers to interrogatories and

14   potentially produce some witnesses, PMK, or 30(b)(6) type

15   witnesses, so I can address that once Mr. Weiss and Mr. Seeger

16   have -- -

17            MR. WEISS:  Your Honor, Mel Weiss again.  I think it

18   would be wise if we didn't have a discussion on these issues

19   at this time.  The discussions that I've had with Ms. Gussack

20   indicated to me that we should have an attempt in the next

21   week or two to come to a resolution of these issues that

22   Mr. Lopez will agree to. He and we are working closely

23   together in these cases, and rather than exacerbate a

24   situation that seems to have become sort of acute in that

25   state court proceeding --

21

1        THE COURT: Can you be more specific?

2        MR. WEISS:  Well, frustration on the part of

3    plaintiffs on getting documents from the defendants.

4        THE COURT:  I see.

5        MR. WEISS:  It is not unusual, Your Honor, when you

6    have an MDL situation for defendants to be using the fact that

7    there is going to be an MDL judge who will be in charge of

8    pretrial discovery issues to try to put off all of those

9    issues until it is transferred to the transferee judge, but we

10   all have a desire, given the seriousness of the injuries that

11   we alleged in the complaints, to get the discovery done as

12   quickly as possible, and I would merely suggest that we have a

13   week or two of meet and confers and maybe set another time to

14   meet with Your Honor if we can't come to an agreement.

15       THE COURT:  Well, Magistrate Judge Chrein will, if

16   there is no objection call the state judge. I don't think

17   there is any point in my calling him directly unless you feel

18   nhe will be insulted by having a magistrate judge call who

19   will undoubtedly supervise discovery here initially.  Is there

20   any object to his calling the state judge?

21       MR. LOPEZ:  Not at all.  In fact, we would be

22   honored if the Magistrate called.

23       THE COURT:  Give him my regards. You are going to do

24   the main preliminary work.

25       MR. WEISS: Your Honor, I want to make clear that the

22

1    PSC, the Plaintiffs Steering Committee is formally adopting

2    the discovery requests that were made in the state court

3    proceeding, so we don't have to reinvent the wheel, and the

4    defendants have been put on notice now for eleven months as to

5    what they are being requested to produce.

6          MR. GUSSACK: Your Honor, if I may address that, Mr.

7    Weiss is correct that yesterday counsel conferred yesterday

8    and agreed that the second set of discovery that was served in

9    the Rodriguez case -- California state court case, would be

10   the first set served in the MDL, and we would respond.  And

11   while I won't belabor the Court and proceedings now with the

12   recitation of our position in the Rodriguez case, the fact of

13   the matter is that almost a million pages of documents have

14   been produced there and Judge Spitzer last week quite straight

15   forwardly said I didn't see any kind of obstreperous contact

16   on either side.  I see parties trying to work out a reasonable

17   accommodation of very broad discovery and I have confidence

18   based on discussions that occurred between plaintiffs' counsel

19   and defense counsel yesterday that we will be able to agree

20   upon the discovery being reserved in the MDL and production in

21   the documents soon as we can agree on some other prerequisites

22   having to do with objective coding and other housekeeping kind

23   of issues that this document production will begin in the MDL

24   expeditiously.

25          THE COURT:  That seems satisfactory to me. Does it

23

1    to the plaintiff's counsel?

2            MR. WEISS:  Yes, Your Honor.

3            THE COURT:  There is a problem.  Since we have

4    counsel from all over the country, availability of those

5    documents, are they going to be electronically available?

6            MS. GUSSACK:  We are actively conferring with

7    counsel on them, the process of production and the mode and

8    what will be agreeable to achieve plaintiffs' goals and will

9    be acceptable to Lily and I think we are well down that path.

10   Electronic production will primarily be the mode of

11   production.

12           THE COURT:  In this court you'll file

13   electronically.  Are you going to file a hard copy as well?

14           MR. WEISS:  Yes.  Your Honor sent out a notice to

15   all counsel advising us that that is the way we should file.

16           MS. GUSSACK:  Yes, Your Honor.

17           THE COURT:  Okay.  Because we want to make it

18   possible for everybody to be kept abreast as conveniently as

19   possible with the least possible cost.

20           MS. GUSSACK:  Yes, Your Honor.  In fact, plaintiff

21   and counsel are engaged in discussions about the third party

22   vendors as a way of trying to make certain pleadings --

23   service more efficient, so all of that is on the agenda --

24   items that we are discussing.

25           THE COURT:  Good. Yes?

24

1          MR. LOPEZ:  Judge Spitzer who is a state court

2     judge, because of what is going on in that county with

3     criminal court cases and his calendar, because of the volume

4     of this discovery and the issues, we have already filed our

5     papers.  In fact, we brought them a box here in case His Honor

6     was interested or the Magistrate. He's asked us to stipulate

7     to a person that JAMS or some retired judge or special master

8     to work this out, if we can.  It is apparent to us that there

9     are going to be some issues that are going to be needed to be

10    worked out by a court somewhere, and I have no problem

11    certainly with Your Honor and Judge Spitzer or your Magistrate

12    and whoever Judge Spitzer  agrees --

13          THE COURT:  He is not my magistrate.  He is the

14    Magistrate Judge of the Eastern District of New York, formerly

15    the Chief Magistrate Judge.

16          MR. LOPEZ:  The Chief Magistrate and whom we

17    stipulate to in this state court case to know working

18    together.

19          THE COURT: Well, I have no objection to having the

20    parties work this out. I am not so sure I want to bring in

21    JAMS and other intermediaries at this stage, unless it is

22    absolutely essential.

23          MS. GUSSACK:  Your Honor, if the Lily preference

24    would be known, we would like to see if we could have the MDL

25    be the recipient of the primary discussions on the discovery

25

1   and so seek coordination of state courts as much as possible

2   with Your Honor and the Magistrate Judges's assistance.  We

3   can accomplish what needs to be done.

4           THE COURT:  It does seem to me with the kind of

5   experienced counsel we have, at least at this stage, you don't

6   need JAMS in here.

7           MR. WEISS:  And Your Honor, Mr. Lopez is on the

8   steering committee and he's going to work with us and those

9   decisions will be made by the steering committee, and I think

10  we understand what Your Honor would prefer in terms of case

11  management on discovery issues.

12          Thank you.

13          THE COURT:  Now, after we break up here, you may

14  want to go to lunch, but the Magistrate Judge wants to see the

15  key players.  I suggest that it is convenient to see them here

16  unless you'd rather see them in your office.  I am free?

17          THE CLERK: You are, Judge.

18          THE COURT: So after we break here, the Magistrate

19  Judge will pick up as the discussion as part of his initial

20  control.

21          I received this interesting letter with documents

22  from plaintiffs' counsel attached dated June 14th.  I received

23  it earlier this morning.  It seems to me valuable.  Has every

24  everybody seen it?  It gives the plaintiff's view of some of

25  the scientific background and other information and parallels

26

1   that which I've already received from the defendants.  It's

2   kind of background on science.

3        MS. GUSSACK:  Yes, Your Honor, we received the full

4   package this morning and we will provide the Court with

5   attachments to our position and as to plaintiff's lead counsel

6   as requested.

7        THE COURT:  Now, is there anything else you wanted

8   to take up at this time anybody?

9        MR. SEEGER:  Chris Seeger.

10        Just briefly, the new manual for complex litigation

11   has provided in it an interim preservation order on electronic

12   information and things like that.  We've chosen at this point

13   not to seek Your Honor's entrance of that order but to try to

14   work out electronic production issues with the defendants and

15   I think we are off to a very good start in that respect.

16   However, we would like to, at least, have the opportunity

17   maybe with Judge Chrein or yourself, if  we can't reach

18   agreement in a week, we don't want electronic information

19   lost.  May we seek an entrance of an internal order?

20        THE COURT: Yes.  It is hard to get to sleep any

21   night without thinking of ways the destruction of our

22   electronic data can occur.

23        MS. GUSSACK:  Then I will call Your Honor at two in

24   the morning when I am thinking -

25        THE COURT:  At two o'clock I am always thinking

27

1  about the electronics.

2          MS. GUSSACK:  You will be reassured to know that

3  Lily has taken appropriate measures from the beginning of

4  litigation, actually before the first case was filed here, to

5  reserve documents.  Nonetheless, we stand ready.

6          MR. SEEGER:  We have no reason to doubt that is the

7  case.  By way of updates, again we will raise it with

8  Judge Chrein, we are off to a good start on negotiating a fact

9  sheet of plaintiffs and deposition protocols and things like

10 that.  You can speak about that.

11         THE COURT:  Well, let me tell you just so you

12 understand my own ignorance of the field, that I have read all

13 your papers.  I found those presentations on the science

14 helpful.  I have read at least some of the package inserts and

15 material. I am concerned about what I considered, at least on

16 my reading, to be very serious epidemiological problems in

17 presenting the case.  For instance, there seems to be so many

18 confounding factors that make it difficult for me to get a

19 handle on how it should go. At the very least you have some of

20 these patients who apparently gain weight as a result of their

21 medical problems independently, or show a greater weight gain

22 than the populous generally. Apparently, at least it is so

23 claimed, there is a somewhat greater indication of diabetes in

24 the various syndromes associated with the mental problems

25 independent of the drugs.  And how you put that into your

1    computations is difficult to deal with, particularly since we

2    have, apparently, from my reading of the New York Times and a

3    few other things I read, populations generally growing in

4    weight and generally growing in diabetes problems. So you have

5    that line of increase that has to be cranked into the

6    epidemiologist's work.

7         You have nine change warnings over time and various

8    people who are starting the drug, or continuing the drug,

9    during those changes in the warnings.  How should that

10   handled?  Sub classing?  It is hard for me to see how that

11   fits in, but it obviously is going to be part of the problem.

12   You have changing views of science, apparently, over the

13   years, and of what the dangers were, and in the literature.

14   Therefore the notice problem of when it would be reasonable to

15   know and what the manufacturers actually learned,

16   intermediaries, and so on as knowledge increased over the

17   years.

18        We have the problem of how we are going to gather

19   the information so it can be used to prove cases and go to

20   trial or for settlement purposes if there is a class action

21   certified. There is no application yet for class

22   certification.

23        We have this consensus report that seem like a

24   fairly powerful document but it wouldn't seem to me to be

25   enough.  We have a variety of studies that have been

1    published, but I don't see any META analysis or anything else

2    that seems definitive.

3            Apparently new studies are on the way. Who is doing

4    them, whether they are independent, whether they are arguably

5    tainted by connection to some of the parties, I don't know.

6            I do not want to see us involved in some of what I

7    consider the failures of the legal system in connection with

8    major cases where the science was not sufficiently defined. I

9    don't have to mention the cases to the people in this room,

10   but there have been a number of them.

11           I'm not going to even consider certification or any

12   disposition or anything of any major significance in disposing

13   of the cases until I have some sense of satisfaction with

14   respect to my understanding (which is the least common

15   denominator lay understanding) of how the scientific issues

16   play out -- where we are and who is going to be testifying and

17   what the Daubert problems are.

18           I don't even want to mention rule 706 at this point

19   or anything like that, but I'd like to know where the science

20   is, so I'm satisfied that there is something to the case.

21           It is my understanding that the Second Circuit still

22   apparently maintains the position that it is inappropriate in

23   considering questions of certification, and perhaps

24   consolidation, to consider the merits of a case. That has

25   never been my view.  I published some years ago my view on the

30

1    matter in 163 FRD 369, indicating that I thought the Second

2    Circuit was wrong on that point.  It's gotten even more wrong

3    because reforms of the class actions have made this such an

4    unwieldily piece of legal machinery.  Before we get much

5    further I want to know where this case is going, so we don't

6    waste a lot of time.  The Seventh Circuit has spoken on the

7    matter through Circuit Judge Easterbrook,  Seventh Circuit in

8    Bridgeport, Seventh Circuit 249 F.3d 672.  I really would like

9    to know soon where the case is going.

10           I would like, after we get started and with respect

11   to control we are going to have here by our distinguished

12   former Chief Magistrate Judge and whatever state judges

13   participate, to know what the milestones are going to be with

14   respect to when you expect to complete what phases of

15   discovery.  I want to know who is going to be deposed when,

16   and for what purpose, laid out in some detail.  What kind of

17   documents are you going to be seeking and for what purpose

18   should be laid out in some detail with milestones.  Scientific

19   inquiries should be specified in some detail with milestones

20   so we know where we're going.

21           I do not want this case dragging on any more than it

22   needs to.

23           The scientific problem, as all of us recognize in

24   those cases, is that we have to get good science and getting

25   good science in a timely way is very difficult.  It is very

31

1   hard to get good scientists to become involved because they

2   have other things to do.  If we wait for the scientists to get

3   their hypotheses lined up, particularly with things constantly

4   changing, everybody involved will be dead.  So perfection is

5   out of the question.  But we do have a very practical problem.

6   The material you furnished is very useful, but it is

7   suggestive only.  Until some persuasive statistical

8   correlations, there does not seem to be enough to start the

9   engine up.

10          MR. WEISS:  Your Honor has spoken words that mirror

11  plaintiffs' view of things. We are in the process of trying to

12  work out a stipulation tolling the statute of limitations for

13  individual claims as a trade off for dropping the class

14  allegations with respect to the individual injury and damage

15  aspects and perhaps just leaving the medical monitoring.

16          THE COURT:  I don't understand what you are saying.

17          MR. WEISS:  We -- the defendants have discussed with

18  us the possibility --

19          THE COURT:  I understand the waiver of the statute

20  of limitations but what are you getting in return?

21          MR. WEISS:  That we will amend the complaint and

22  drop the class allegations with respect to the personal injury

23  aspects from plaintiff.

24          THE COURT:  What are the personal injury aspects of

25  the complaints.

32

1      MR. WEISS:  A class action for the personal injury

2  as opposed to medical monitoring. There are two prongs for the

3  class allegations.  One is a medical monitoring class and the

4  other is a class --

5      THE COURT:  I understand that but it is very hard

6  for a fiduciary to trade off rights of possible putative

7  clients. Unfortunately, as you know, and we all know, we have

8  got a very skittish set of Courts of Appeals. They are

9  concerned because of what happened in the asbestos cases.

10  Anything that looks like it might be a conflict or what might

11  not be complete and comprehensive is open to objection.  We

12  had that in the Agent Orange case.  Ten, fifteen, twenty years

13  people come in in a class action and the Second Circuit says,

14  well, they weren't represented because nobody knew they were

15  going to get in sick 20 years.  We knew many were going to get

16  sick 20 years from then, but there were so many confounding

17  factors by then as they aged that we didn't think we needed to

18  take that into account, those who became ill in their forties.

19  But the Second Circuit is, and the other circuits apparently

20  are conerned because of what happened in the asbestos cases.

21  I'm not saying your proposal is a wrong approach.  It sounds

22  like a very sensible approach, but we've got to be very

23  careful of it.

24      MR. WEISS:  We fully understand that, Your Honor,

25  and we also have to take into account the likelihood of

1  success given the jurisprudence that exists, and if we can get

2  something that will protect the individual claims of people

3  whose rights might expire as a result of the passage of time,

4  and then it would be up to Your Honor to permit us to do it,

5  so we would have to make out a record that would satisfy the

6  Court, that as fiduciaries in a fiduciary litigation, such as

7  a class action is, that this is a prudent approach.

8         THE COURT:  I have no a priori objection to any such

9  approach.

10        MR. WEISS:  That is why I wanted to raise it.

11        THE COURT:  The fact of medical monitoring, of

12 course, as always raises the problem of economic benefit and

13 cost -- medical monitoring.

14        MR. WEISS:  We understand that, Your Honor.

15        THE COURT:  Medical monitoring of millions of people

16 even if it costs only a hundred dollars a person, may be more

17 costly than dealing with tort-based recoveries for the people

18 who are actually adversely affected.

19        MR. WEISS:  But what I wanted to impress upon the

20 Court today is that because we have virtually all of the

21 individual actions present in the court and backing the work

22 of this litigation and this steering committee, the discovery

23 can go forward because it will aid all of those litigants and

24 the class issue should not be variant to our dealing with the

25 substantive and procedural issues that the gentleman from

34

1    Louisiana was talking about. He has a client and we want to

2    take care of his needs.  So I think we are making a progress

3    with the defendants in that regard, and we certainly are

4    cognizant of what Your Honor is saying, and of course, as

5    individual cases, we have burdens of proof that we will have

6    to convince the trier of fact should support our cases and we

7    have to deal with the very issues Your Honor outlined.

8              THE COURT:  Well, I want to emphasize that I am very

9    encouraged by you distinguished experienced professional

10   people who are handling the case on both sides.  It is much my

11   preference to let the attorneys handle everything. I don't

12   want to get involved in the any of the details, and I'm sure

13   the Magistrate Judge would prefer that autonomy, he says, is

14   the word.  So I am just saying these things because they are

15   on my mind as a result of reading your initial papers.  We

16   just have to go forward very carefully so that we don't waste

17   a lot of time creating a disposition that doesn't protect

18   everybody because the Court of Appeals will reject it.

19             MR. WEISS:  And Your Honor, just to make it clear,

20   the plaintiffs are ready for any mechanism that Your Honor

21   wants to pursue to satisfy the Court that the science will

22   support our claim. We can do that today, tomorrow, but we

23   don't think it is sufficient to do it that way. We think that,

24   as Your Honor outlined earlier, we should get the discovery

25   done that is necessary to tee it up once and finally, and to

1   do it right, rather than do it in a premature fashion, but if

2   Your Honor is really uncomfortable --

3           THE COURT:  No, I am not uncomfortable having

4   listened to counsel. I am quite comfortable that you are going

5   to handle it well.  I am uncomfortable only with my lack of

6   knowledge.  Here I just have a vague feeling, but you will

7   correct that.

8           MR. WEISS:  Absolutely.

9           THE COURT:  Is there anything else?

10          MS. HIRSH: Nancy Hirsh, Hirsh & Hirsh.  We are from

11  California and we have filed on file at the present time

12  approximately thirteen cases, six state court cases and seven

13  cases in the federal court.  We, too, have been dealing with

14  outstanding discovery for, approximately, ten months. I

15  believe that we have filed the first Zyprexa case, and I just

16  wanted to reassure the Court that prior -- it is our practice

17  and has always been our practice in our law firm never to file

18  a case without doing substantial due diligence prior to

19  filing, which we undertook in this instance speaking to

20  representatives of various entities, and scientific

21  persuasions before we ever filed the case. We are satisfied

22  that the science pre-existed the filing of the cases. I know

23  what instances to which the Court is referring.  This is

24  substantially different.  The science pre-existed.  The

25  scientists are available.  We have already a science committee

36

1    that has met, and we have on board very well qualified

2    consultant and I feel confident that when the Court is able to

3    know and understand these cases further that you, too, will

4    agree that the science is reassuring and the science supports

5    the plaintiffs' claims.

6              THE COURT:  Thank you, very much.

7              MS. HIRSH: Thank you.

8              MR. THOMPSON:  Jeffrey R. Thompson.

9              THE COURT:  Come forward so the reporter can hear

10   you. Jeffrey Thompson, Knoxville, Tennessee.

11             MR. THOMPSON: Your Honor, we are involved in a case

12   that predated all these Zyprexa and Eli Lily cases by,

13   approximately, three years.  The case was filed back in

14   December of 2000.  I am representing Roan County, which is a

15   small jail down jail in Eastern Tennessee.  The allegations

16   against my client and the individual clients are issues

17   related solely to Section 1983 allegations.  They have

18   absolutely nothing to do with any of Eli Lily or Zyprexa or

19   anything like that. We initially opposed this case coming up

20   here in the MDL, and the MDL panel noted that.  Your Honor, in

21   transferring the case that Your Honor could actually rule on a

22   motion for summary judgment that have been filed in the past.

23   We have a motion for summary judgment that Judge Philips had

24   down in the Eastern District of Tennessee that was filed about

25   two years ago, April 22, 2002, and before Judge Philips could

37

1  rule on that motion it was taken up and sent up here, so if

2  Your Honor has no objection and none of the other counsel have

3  objection, we would like to know if we can get that motion set

4  for hearing or somehow dispose of that.  This case is not the

5  basis for a motion, is not having anything to do with Eli Lily

6  or Zyprexa or anything else that is involved in all these

7  other lawyers are here.

8          MR. ROGOFF:  We would have no objection to

9  Your Honor ruling on that motion, but we could even make it

10  more efficient for this Court, if this Court granted our

11  motion to dismiss based upon the statute of limitations that

12  case could go back to Tennessee.  They could litigate their

13  civil rights case and it would be one less case in the MDL.

14  So  either way we would be pleased if the Court rules on it.

15          THE COURT: What would you prefer?

16          MR. THOMPSON:  Either way.  We don't feel we should

17  be a part of this MDL,  but it is solely based on our motion

18  for summary judgment which could be heard either here or in

19  Tennessee.  It really makes no difference.

20          THE COURT:  What is the action?  What is the theory,

21  that you shouldn't have given the prisoner the drug?

22          MR. THOMPSON: Well, the complaint is about 30

23  something pages long, Your Honor, but the basic thrust is the

24  deliberate indifference to the serious medical need and

25  Fourteenth and Eighth Amendment.  Violations based on that.

38

1   However, you know, obviously, a jail didn't have anything to
2   do with the prescription of drugs or anything like that.  All
3   we did was tended the lady when she started having problems.
4          THE COURT:  You mean her physician prescribed this?
5          MR. THOMPSON:  Yes.  Physician prescribed, who is
6   also a party to the case.
7          THE COURT:  What is your motion?  What would you
8   like me to do?
9          MR. THOMPSON:  Set our motion for hearing, Your
10  Honor, in this court.
11         THE COURT:  Okay. What date would you like?
12         MR. THOMPSON:  Any day in the next couple of months
13  that is convenient for the Court.
14         THE COURT: Is it convenient for you to come to New
15  York?
16         MR. THOMPSON: Certainly, Your Honor.
17         THE COURT: You could do it by phone.
18         MR. THOMPSON:  That would be fine as well.
19         THE COURT:  Give us a date about the end of July.
20         MR. THOMPSON:  I will note that counsel for State of
21  Sonny Philips is not present and subject to his availability
22  on the date.
23         THE COURT:  Well, everybody can appear by telephone,
24  if they would like.
25         MR. THOMPSON:  Yes,sir.

39

1        THE CLERK: August 2nd.

2        THE COURT:  August 2nd at what time.

3        THE CLERK: Ten.

4        THE COURT:  Ten.  Is that convenient for you?

5        MR. Thompson:  That will be fine, Your Honor.

6        THE COURT:  Would you get in touch with your

7    opponent and tell him and you can all appear by phone if you

8    would like.

9        MR. ROGOFF:  We will work it out.

10        THE COURT:  Just get me all the documents please.

11        MR. THOMPSON:  Thank you.

12        MS. GUSSACK:  One housekeeping matter relating to

13    the Thompson case in which the plaintiffs have voluntarily

14    dismissed Eli Lily.  The Court has approved that stipulation

15    of that dismissal, and the case is ready to be remanded to a

16    transfer court and I wanted to alert the court that we would

17    be apprising you promptly through the papers and I think it is

18    ripe for remand and I don't think there is any opposition.

19        THE COURT:  Any objection?  So prepare an order and

20    I will sign it.

21        MS. GUSSACK:  Thank you.

22        THE COURT:  Thank you, very much.

23        (Proceedings concluded as above set forth)

24                    oOo

25

*MARSHA DIAMOND, C.S.R.*
*OFFICIAL COURT REPORTER*