1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - X

IN RE:                              :    04 MD 1596

ZYPREXA LITIGATION                  :    U.S. Courthouse
                                         Brooklyn, New York

                                    :
                                         November 9, 2005
                                         11:00 o'clock a.m.

- - - - - - - - - - - - - - X

                TRANSCRIPT OF CONFERENCE
          BEFORE THE HONORABLE JACK B. WEINSTEIN
              UNITED STATES DISTRICT JUDGE.

Court Reporter:                    Anthony M. Mancuso
                                   225 Cadman Plaza East
                                   Brooklyn, New York 11201
                                   (718) 260-2419

Proceedings recorded by mechanical stenography, transcript produced by CAT.

---

**3**

1    service, the competence and the skill of plaintiff counsel.
2    There must have been thirty altogether that we've worked with,
3    absolutely first rate, in an effort to develop a settlement
4    protocol that can be used efficiently, quickly, consistently,
5    openly, to satisfy the needs of over 8,000 plaintiffs that are
6    part of the protocol.
7         Your Honor, the protocol that was transmitted to you
8    last week, with the plaintiffs' unanimous cooperation and
9    approval, basically, as you know, without getting into the
10   dollars in the confidential settlement, but basically has a
11   few points that are worth highlighting, because they are
12   rather creative.
13        There is a Track A quick payment, designed to close
14   out as many of the 8,000-plus cases as can quickly be closed
15   out by a simple filing without the Special Masters being
16   required to further examine any of the medical details that
17   would otherwise accompany the claim.
18        There is a Track B alternative.
19        THE COURT: As to Track A, you might consider
20   raising the amount very slightly, because when fees are taken
21   off, there won't be very much left for those people, and we
22   want, I think, to see as many in Track A as possible, in order
23   to reduce transactional costs and the burdens on the Special
24   Masters. So, at least consider that.
25        MR. FEINBERG: Thank you, your Honor.

---

**2**

1         (Case called; both sides ready.)
2
3         THE COURT: We have some seats up here in the jury
4    box.
5         I understand we have some distinguished counsel from
6    Louisiana. Where are they? We in New York deeply sympathize
7    and sent whatever we could down in money. I've sent a little.
8    And we appreciate what you did when we had 9/11.
9         Anybody else from the far corners who want to sit up
10   here?
11        All right. I think probably the best thing to do is
12   to hear from the Special Master. His services are required
13   all over the world, and we don't want to keep him here at his
14   rate too long.
15        MR. FEINBERG: Special Master Kenneth Feinberg here.
16        There are three other Special Masters you have
17   appointed: Cathy Yanni, Judge Trotter and Michael Rozen. I'm
18   not sure if they are here today. I don't think they are.
19   They have worked very closely with me. We have had
20   extraordinary cooperation from the plaintiffs and the steering
     committee concerning the settlement program.
--        We have met on both coasts, probably for the last
23   three months, working on developing a settlement protocol to
24   submit to the Court.
25        I must state on the record the extraordinary

---

**4**

1         As to Track B, there are designated injuries, a few,
2    a few designated injuries, as you know, your Honor, on Exhibit
3    A, attached, that lays out some basic medical criteria that
4    have to be met in order to satisfy the Track B base award, and
5    we submitted that Exhibit A, which points out the
6    diabetic-related characteristics.
7         THE COURT: I thought they were too complex. It
8    seemed to me they ought to be simplified with a simple letter
9    from a medical person who is admitted, subject to control at
10   the state level. If you find too many from the same doctor,
11   as in the asbestos cases, just don't take them, and require
12   another doctor.
13        I would simplify that. I think that if you are
14   going to use a matrix, try to make it as simple as possible.
15        MR. FEINBERG: How do we deal with the problem, your
16   Honor, if we get a score of letters from the same doctor,
17   almost like rubber-stamping?
18        THE COURT: I think the Special Masters have the
19   absolute right, under those circumstances, to say, We're not
20   going to take them. Give us another doctor. If there's a
21   due-process problem, let them take an appeal. I have very
22   great confidence in the common sense and experience of the
23   Special Masters we have here. I know that you won't be
24   arbitrary. You never have been. But if this is going to turn
25   into an asbestos type, in some cases, not in this court, but

**EXHIBIT D**

**PAGE 1 OF 8**

5

1 in some cases, it's been suggested, exuberance of
2 certifications, I don't want them.
3        MR. FEINBERG: There's also a Track C, with two
important foundations. Track C is a special track that allows
for enhanced monetary benefits for a very small list of
6 designated injuries and death on top of Track B.
7        THE COURT: I saw that, and I don't care for it.
8        I think it would be desirable to collapse B and C
9 with specific criteria that can be met by the physician. If
10 there's a question about it and the person wants a personal
11 hearing before one of you, compassionate hearing to see if
12 there are extraordinary circumstances, why, give it. If you
13 are going to use a matrix, let's be simple and quick, and the
14 whole system should be designed to get a quick decision, fair
15 decision, due process, and get the money out.
16        MR. FEINBERG: Your Honor, there's also a provision,
17 as you know, in Track C, that allows for a very small number
18 of these claimants to wait and see.
19        THE COURT: That opt-out provision seems to me to be
20 impossible.
21        You're either in or out, right from the beginning.
22 Either you believe that the system is fair, you have some
23 confidence in the Special Masters, or you don't. If you don't
24 want it, it seems to me you are out, and we'll give you
25 pretrial and trial as needed.

6

1        It seems to me that the criteria are sensible and
2 generous, and beyond that, a later opt-out makes no sense at
3 all to me. It just seems to me you ought to revise that out
4 of the case.
5        MR. FEINBERG: Your Honor, how do you deal with the
6 problem that the Special Masters discovered with plaintiff
7 counsel, during the discussions of a very serious case, where,
8 in light of the fact that the particular claimant may not know
9 the amount of enhanced extraordinary circumstances --.
10        THE COURT: You can provide for an initial payment,
11 and then hold off later, in your discretion. I see no reason
12 why you can't be compassionate in that respect.
13        MR. FEINBERG: I take it that your Honor has said
14 --.
15        THE COURT: But I would suppose that that would be
16 in a very, very small number of cases. The plaintiffs ought
17 to know what the case is, and the doctors ought to know what
18 the case is. This ought to be very, very small. I don't want
19 to see the Special Masters burdened, and I don't want to see
20 these cases hanging over.
21        MR. FEINBERG: Two final points, your Honor, and I
22 think your Honor's commented on this already. I want to make
23 sure I understand. I take it your Honor, with some
24 skepticism, doesn't oppose, though, the idea of a hearing with
25 the Special Master to show extraordinary circumstances?

7

1        THE COURT: No. I think if you want to do that,
2 that's fine. It's reflective of your compassion, as already
3 shown in the 9/11 cases. If you want to assume that burden, I
4 think that's fine, and it will take care of the problem of
5 some people who want to be heard.
6        MR. FEINBERG: Final point, your Honor. In light of
7 the suggestions that you have made this morning, which we
8 will, of course, implement, it's apparent to me that we can
9 accelerate the time line for the payment of this money. One
10 reason: That the time line that we worked out -- and the
11 plaintiffs were fabulous on this -- it was just based on the
12 different variations, on the different requirements, the
13 medicine, the evaluation of medical criteria. It obviously
14 was going to take time. With your suggestions, it's apparent,
15 to me at least, that we should be able to accelerate the speed
16 at which this money is paid out.
17        THE COURT: That seems to me to be desirable.
18        MR. FEINBERG: Finally, your Honor, not one nickel,
19 not one nickel, of the settlement proceeds that are currently
20 in escrow has yet been spent. We have been waiting for this
21 hearing and the opportunity to hear from the Court. I can
22 resubmit to the Court, within the next few days, a revised
23 protocol.
24        THE COURT: Of course, you want to discuss it with
25 the parties.

8

1        MR. FEINBERG: Of course.
2        THE COURT: They may have different views. It's
3 their case, not mine.
4        MR. FEINBERG: What I would like to do, with your
5 permission, is, having discussed with plaintiff counsel in the
6 next few days, retransmit to you a revised protocol, and then
7 have your approval to begin to disseminate funds, both to the
8 Special Masters, I might add, but also to -- for various
9 expenses associated with the claim infrastructure.
10        THE COURT: That seems desirable. Now, there's 700
11 million in the bank. What kind of interest is that money
12 getting?
13        MR. FEINBERG: Mr. Weiss or Mr. Seeger. Thank you,
14 your Honor. This completes my report.
15        THE COURT: Does anybody wish to address any
16 questions to the Special Master?
17        MR. HAHN: The Special Master should be mindful, in
18 the Track A, we struggled with giving those people more money,
19 and we had issues with them losing their Medicaid benefits or
20 the special-needs trust. There's a tension there that we need
21 to be mindful of.
22        MR. FEINBERG: The concern is, if the amount is
23 raised, there's a lien problem.
24        MR. HAHN: That's correct.
25        THE COURT: What's the lien problem? When does it

EXHIBIT D

PAGE 2 OF 8

9

1  kick in?

2          MR. HAHN: $3,000, I believe.

3          MR. SEEGER: It varies. The groups hired an expert
on these lien issues. We have to bring it back to him.

          THE COURT: That's a confounding factor in all these

6  segments that makes it very difficult. We already have a

7  claim from some of the unions and Medicare, Medicaid, Blue

8  Cross. They were all there with claims.

9          MR. SEEGER: Mr. Garitson, we can have him report to

10 the Court, we have hired him as an expert. We have to go back

11 to him.

12         THE COURT: They have to be dealt with. It's really

13 not all medical costs. There's an awful lot of pain and

14 suffering in this thing. It may well be that a ruling from

15 the Special Master, after holding a hearing, of course, might

16 obviate some of that problem.

17         MR. SEEGER: It's not necessarily just sort of the

18 tax-type issue. If somebody gets over a certain amount, they

19 may lose government benefits. To give them $10,000 and they

20 lose $50,000 in benefits wouldn't make sense.

21         THE COURT: That's up to the claimant. Don't force

22 money on anybody.

23         MR. HAHN: Your Honor, based on the terms of the

24 settlement, with your permission, what we would like to do is,

25 have Mr. Garitson work with the Special Master and get them as

10

1  much they can under A without losing benefits.

2          THE COURT: Absolutely, I agree.

3          MR. LOPEZ: Obviously, some of the things that you

4  have discussed here today, or Mr. Feinberg has, are

5  suggestions that we worked a long time to get to where we are.

6          The only thing I would ask -- and I like what the

7  Court said at the end, that Mr. Feinberg please discuss these

8  issues with us before he resubmits a revised version of

9  this -- let me say, from someone that's from 3,000 miles away,

10 I will stay over until tomorrow, if we're interested in

11 expediting and the expediency of this program, to meet with

12 Mr. Feinberg and go through some of these issues, there's not

13 a delay, so we don't have to find out where we can meet some

14 day when everyone is together. I speak for a lot of us. We

15 would like an opportunity to sit down and discuss it with

16 Mr. Feinberg.

17         THE COURT: I know you have all devoted an enormous

18 amount of time, and your skill is reflected in the nature of

19 the process.

20         THE COURT:  I think Mr. Feinberg has another
meeting.

         MR. FEINBERG: The question of the interest.

23         MR. SEEGER: Your Honor, right now, there is 500

24 million in an account being held at Citibank. As you know,

25 the total settlement amount comes out to approximately 700

11

1  million. The balance is to be paid by December 15. But the

2  amount that's held back by Lilly is accruing interest. So,

3  when it is finally fully funded, we'll get all the interest

4  from the date of the settlement.

5          THE COURT:  What's Citibank paying?

6          MR. SEEGER:  3.65 percent, fully protected, no risk

7  at all. It's about as secure as you can get.

8          THE COURT:  Fully insured?

9          MR. SEEGER:  I believe it is.

10         THE COURT:  Make sure it is.

11         MR. SEEGER:  Yes, your Honor.

12         THE COURT: The banks are under pressure.

13         MR. SEEGER:  Citibank needed the money.

14         The amount of interest accrued through October 31 is

15 $2,079,423.38.

16         THE COURT:  Well, as long as you have your eye on

17 it.

18         MR. SEEGER:  Absolutely.

19         MR. WEISS:  One thing on the doctors' reports. I

20 think your Honor is suggesting that the Special Masters can

21 have options as to how to deal with those issues, including

22 interviewing the doctor or putting them under oath?

23         THE COURT:  No. I don't want that. He'll have the

24 option, but I wouldn't expect them to do that at all.

25         MR. WEISS:  But, your Honor, if we're trying to cut

12

1  the cost and a doctor has a good reputation and it looks like

2  there's fifteen or twenty opinions that are similar, can't we

3  have another alternative than having to run up a big expense

4  by having individual reports?

5          THE COURT:  The Special Master is still here. I

6  would expect you would get on the phone and talk to the

7  doctor.

8          MR. WEISS:  Right.

9          THE COURT:  Which is the simplest way to handle it;

10 right?

11         MR. FEINBERG:  I think that's right. Mr. Weiss

12 always has good ideas. I'll be glad to chat about this with

13 Mr. Weiss, as well.

14         THE COURT:  We don't want to destroy anybody's

15 reputation. There have been some instances in other cases

16 where we have had problems. We want to obviate them.

17         MR. WEISS:  We agree with that.

18         THE COURT:  Okay. Thank you.

19         The Special Master's view is, they ought to be able

20 to interview, should be followed. I expect that the attorneys

21 would not abuse that opportunity.

22         Now, as I understand it, there are about 250

23 claimants now in here who haven't been in the settlement;

24 right? Is that right?

25         MS. GUSSACK:  Your Honor, Nina Gussack for defendant

**EXHIBIT D**

**PAGE 3 OF 8**

13

1  Eli Lilly & Company. My most recent tally suggests there are
2  about 320 plaintiffs pending in the MDL or being transferred
3  in as a result of the additional transfer order.
        THE COURT: Well, as to those, whether the parties
   want to bring them into the settlement or not, I don't know.
6  That's up to them. But I suggest that the defendant Lilly
7  promptly bring a motion for summary judgment, and let's have
8  the experts that Lilly's relying on and that the nonsettling
9  plaintiffs are relying on. If necessary, have a Daubert
10 hearing, and suggest what the science and the rulings will be.
11       Now, any case coming in on the federal track will
12 come here. But there are all these state cases that I can't
13 control, nor would I attempt to control them, as a matter of
14 comity and respect for the fine state judges that will be
15 handling them.
16       Nevertheless, since we have had the case and there
17 is a primary responsibility here for preparing cases, I'll be
18 prepared to hold summary-judgment hearings and Daubert
19 hearings, at a minimum Daubert hearings. I don't want a whole
20 series of experts, maybe one or two from each side, and
21 suggest then, to the extent that the state judges and lawyers
22 want to hear it, what the situation is as we view it here.
23 But you can consider that.
24       But I'm prepared to at least go that far, and then,
25 depending on how it goes, you might want to bring them those

14

1  300 or so cases. I expect there's not going to be a new flood
2  of cases in the federal courts. I'm dubious, as I indicated
3  right at the outset, about these cases. Okay.
4        MS. GUSSACK: Your Honor, thank you. We will
5  proceed on that basis. We may need to set a framework in
6  which to pick those cases in which we would bring a
7  summary-judgment motion, and I take it we could work with the
8  Special Master to frame those issues.
9        THE COURT: Yes, he'll make it move as quickly as
10 possible. I don't want a lot of extensive discovery. If
11 there's going to be a Daubert hearing, obviously, you're going
12 to have some discovery under the equivalent of Rule 26, but I
13 want to limit the number, limit the issues, to the critical
14 ones, and move it forward to motion practice as quickly as
15 possible, so we can get a disposition on that motion or series
16 of motions by the end of the year or shortly thereafter,
17 okay --.
18       MR. WOODIN: Yes.
19
20       THE COURT:  -- of the indirect purchases, Medicare,
   Medicaid and UFCW, TAYAG claims.
        Who is here on those claims?
23       MR. DUGAN: James Dugan with the law firm in New
24 Orleans and my cocounsel Tom Sobol from Boston. We filed in
25 front of your Honor in the MDL, a case on behalf of consumers

15

1  and third-party payers seeking economic claims. They are
2  completely separate and independent from the pending
3  settlement.
4        What we are requesting, your Honor, is that we set a
5  class-certification schedule. We've had some initial contact
6  with defense counsel. They are willing to sit down and
7  entertain a case-management order and in handling those
8  claims.
9        THE COURT: Are you going to try to handle all of
10 the third-party claims throughout the country?
11       MR. DUGAN: Yes, sir. I've also filed a motion to
12 be appointed lead counsel in the case. My cocounsel, Mr.
13 Sobol, has also filed a motion to be appointed co-lead
14 counsel. We have extensive experience in this type of
15 litigation, and we've worked with a lot of the plaintiff
16 steering-committee members in other cases. We've organized.
17 We have about fifteen law firms that we have organized and
18 that we've worked with. We've been spending the last couple
19 of months reviewing documents, which is evidenced by the
20 consolidated amended complaint that we filed on Monday in
21 front of your Honor.
22       THE COURT: Well, you're certainly not going to
23 represent the federal government in Medicare, Medicaid, are
24 you?
25       MR. DUGAN: No, sir. We will absolutely exclude,

16

1  from our class definition, the governmental entity of the
2  United States Government.
3        THE COURT: What about the various states? They
4  have claims.
5        MR. DUGAN: The state Attorney Generals?
6        THE COURT: Yes.
7        MR. DUGAN: That is correct, I represent the
8  Louisiana Attorney General in several other cases, not in
9  Zyprexa, but I know lawyers who are working on that particular
10 case, and I'll be more than happy to reach out to them to have
11 them participate in any kind of a way they see fit.
12       THE COURT: It gets kind of complex.
13       Is there money that you are trying to get going to
14 come out of the plaintiffs' money?
15       MR. SOBOL: If I may, there is no claim in the
16 complaint that we filed before your Honor for subrogation,
17 either on behalf of private parties or governmental entities.
18       The class definition excludes government entities of
19 any kind, both federal and state government. There's no claim
20 to go after any portion on a class-wide basis for that.
21 Instead, the kind of claim that is before you is the kind of
22 claim that has been filed in other drug-pricing and
23 drug-purchase matters, which is essentially a direct claim on
24 behalf of private entities and private consumers for the extra
25 costs, damages, that they have incurred by reason of the

EXHIBIT D

PAGE 4 OF 8

17

1  underlying wrongful conduct in the complaint.
2        Therefore --.
3        THE COURT:   Not payments that they made on behalf
of the other claimants, direct claimants?
        MR. SOBOL:  How it works in this kind of case, for
6  instance, the claim is not on behalf of increased medical
7  costs generally, as, for instance, you had in the tobacco
8  area, where the claim for the health insurers, there were
9  increased medical expenditures generally by reason of
10 smoking-related illnesses.
11       Instead, in this case, it follows from consumer
12 protection and antitrust cases, indeed, the Second Circuit
13 decision, Desiano case, that if a private plan for a private
14 consumer has incurred damages, i.e., extra pharmaceutical
15 costs by reason of wrongful conduct, and they have a direct,
16 not a subrogation claim, not an indirect claim, but a direct
17 claim under tort law.
18       THE COURT:  Would that include hospitalization?
19       MR. SOBOL:  No.
20       THE COURT:  Just pharmaceutical?
21       MR. SOBOL:  Correct.
22       THE COURT:   That's all you are going to ask for?
23       MR. SOBOL:  That's all that's in this complaint.
24       THE COURT:  In your view, it's distinguishable from
25 Blue Cross, Blue Shield?

18

1        MR. SOBOL:  Yes, it is.  The reason it's
2  distinguishable, you have precedent right in your Circuit,
3  your Honor, in the Desiano case, that obviously postdated the
4  -- I can't remember what the name of the case was, whatever
5  the tobacco third-party payer case was in the Circuit.
6        MR. DUGAN:   The Local Labor 17 case.  I'm cocounsel
7  in that case.
8        THE COURT:   Well, we'll have to deal with this
9  separately.  It's really too complex to even approach it
10 today.  When the parties are ready and have briefed it and
11 have some idea of where they are going, maybe you ought to ask
12 for a conference on that group of cases.  Don't you think that
13 would be wise, rather than addressing it today?
14       MS. GUSSACK:  Yes, your Honor.
15       THE COURT:  So, I'll hold in abeyance everything on
16 that type of case until you get your connections throughout
17 the country straightened out and where you want to go, and
18 I'll hear you.  I'm not prepared to rule at the moment on any
19 class-action appointment of lead counsel.
20       MR. SOBOL:  Obviously, we act at the discretion of
the Court.  If that's the Court's ruling, that's fine.  I'm
not addressing that in any way.
23       What I would suggest is this, your Honor, because we
24 want to be able to, as we've already spoken with counsel for
25 the defendants, sit down with them and be able to be in a

19

1  position of at least some authority.  Right now, it will be
2  informal, at least between now and the time the Court enters
3  an order to discuss the management of this class action.
4        THE COURT:   Until somebody else is appointed, I
5  think you can act as if you were representing this group.  As
6  far as I can see from the papers, you have been taking the
7  lead, haven't you?
8        MR. SOBOL:  Correct, your Honor.
9        THE COURT:   Act as lead counsel without
10 appointment, informal.
11       MR. SOBOL:  Thank you, your Honor.
12       THE COURT:  Is there any objection to that?
13       MS. GUSSACK:  No, your Honor.
14       THE COURT:  You can proceed.  It's really too
15 complex an issue for me to address at the moment.
16       MR. DUGAN:  Thank you, your Honor.
17       (Continued on next page.)
18
19
20
21
22
23
24
25

20

1        MS. GUSSACK:  What we would suggest is to meet with
2  counsel to see if we can identify an appropriate case
3  management order that would be acceptable to the court and
4  then ask for a conference to see if we are on a path to
5  comport with your ruling.
6        THE COURT:  Correct.  I think that is fine.  Do you
7  have individual cases?
8        MR. SOBOL:  No, sir, your Honor.  Obviously, we have
9  the cases that we be filed, we filed consolidated cases.  We
10 have those cases before you your Honor, but only purchaser
11 claim cases not the personal injury cases.
12       Was that your question?
13       THE COURT:  No.  Do you have any personal injury
14 cases such as those that the special master is trying to work
15 out?
16       MR. SOBOL:  No, your Honor.
17       THE COURT:  So you have no conflict so far as you
18 know.
19       MR. SOBOL:  That's right.
20       THE COURT:  We want to be careful with that.
21       No future claims -- and they'll be coming in -- if
22 they come before me, I take it they will be subject to your
23 motion for summary judgment?
24       MS. GUSSACK:  Yes, your Honor.  At we have advised
25 the court, there is intention to litigate the remainder of the

EXHIBIT D

PAGE 5 OF 8

21

1  cases that are not captured by the settlement agreement and

2  that was true of the cases that remain before the court today

3  and those that would be transferred in.

   THE COURT: You make your motion for summary

   judgment, we'll have the Daubert hearings and then the other

6  plaintiffs may reconsider their position and it may be

7  desirable for everybody to come in under the settlement.

8         MS. GUSSACK: I couldn't really speak to that, your

9  Honor, because it is the stated intention to litigate those

10 cases and we believe that our summary judgment motions on a

11 variety of fronts would be before the court.

12        THE COURT: Fine. Some of them, however, may

13 ultimately come in.

14        What are we going to do about fees, is there going

15 to be any limit on fees in these matrix cases? What is the

16 limit?

17        What about the plaintiffs, have you addressed the

18 problem?

19        MR. SEEGER: Your Honor, when you say limit on fees,

20 are you talking about the agreements between counsel and their

21 clients?

22        THE COURT: Yes.

23        MR. SEEGER: I don't think it's been discussed or

24 anticipated that the lawyers in the case --

25        THE COURT: I'd like to know about it. If we're

22

1  going to have a simplified matrix making it easier to get this

2  money, I don't want the money eaten up in fees.

3         MR. SEEGER: We understand that, your Honor.

4         THE COURT: Well, I'd like to hear what you're going

5  to do about it. I'd like some agreement. I'm not going to

6  impose a 20 or 25 percent limit as in the Mansville case. It

7  would seem to me that the expenses should be minimized and

8  something like a 30 percent limit or something like that might

9  be suitable.

10        MR. SEEGER: I think by virtue of the fact that

11 there have been so many firms that have litigated, gone

12 through the discovery, taken the depositions and then

13 negotiated the settlement, that effort in and of itself has

14 limited extensively costs for all of these clients.

15        THE COURT: I'd like to get a report on it

16 ultimately.

17        MR. SEEGER: Seeger Weiss is a New York firm and you

18 know the fee arrangements in New York. Some other lawyers are

19 governed by different rules in different states.

20        THE COURT: I know. I had that in the Mansville

   case and I wasn't happy with some of the fee arrangements

   which had the clients pay the cost and disbursements out of

23 the clients' share and then had a 50 percent fee for the

24 lawyers.

25        MR. SEEGER: Your Honor, could we meet amongst

23

1  ourselves, talk about it, get an idea about what the retainer

2  agreements look like and then come back to you with something

3  on it?

4         THE COURT: Yes. You're obviously not prepared.

5         MR. SEEGER: No.

6         THE COURT: I will state my position plainly so you

7  understand it. This is not a class action, it's a private

8  settlement, right?

9         MR. SEEGER: Yes.

10        THE COURT: It is my view, nevertheless, that

11 because I'm the judge appointed by the Multi district Panel,

12 and I have all these cases, and I have participated to some

13 extent by appointment of special masters of a variety of

14 kinds, this court has a fiduciary obligation to insure that

15 the money is properly spent.

16        It's not a class action, but that is my view. So

17 it's a quasi-class action for purposes of ethics.

18        You don't have to agree and you don't have to

19 express any view at the moment.

20        MR. SEEGER: Just so you know, your Honor, in going

21 into this, we are pretty familiar with you and your thoughts

22 on how these are done, so we knew that. We're not surprised

23 by your comment.

24        THE COURT: All right. I don't want to be

25 arbitrary, but I do feel an obligation to these people who are

24

1  before us.

2         MR. SEEGER: It's anticipated the way the settlement

3  is breaking down -- Mr. Feinberg has more information on it --

4  but these are substantial payments that the plaintiffs are

5  going to receive, and I think part of your concern, not all of

6  it, goes to the hard cost expenses so that you don't --

7  somebody doesn't get a $10,000 payment and there's $10,000 in

8  expenses and they get zero.

9         THE COURT: You understand the problem?

10        MR. SEEGER: We do.

11        THE COURT: The settlement terms are confidential.

12 I haven't said anything about what they are here, but there is

13 some implications. I don't plan to open them up. That is

14 private.

15        The reconstitution of the PSC, it seems to me that

16 is premature at the moment. When you make your motion for

17 summary judgment, you'll list all of the cases against which

18 your motions are made and then the plaintiff's counsel in

19 those cases will have to decide whether they want to come in

20 or what they want to do with it, and then we can deal with it.

21        Some of them may decide that in view of the costs

22 and expenses and difficulties, it is best not to proceed, or

23 they may want to come in on the settlement.

24        MR. WEISS: Your Honor, that what is I wanted to

25 rise to address before.

25

1    As the PSC, we have certain duties and
2    responsibilities to everybody. Your Honor might not know
3    this, but take my firm as an example, we don't have any
     individual cases. We came in to chair this PSC to supervise
     the overall effort and to try to give everybody the benefits
6    of the uniform work of the PSC.
7        If there are going to be Daubert hearings, motions
8    for summary judgment, as the PSC, we have to take a role in
9    that.
10        THE COURT: I don't see that, not if you're retained
11   by the people who are settling. I think your role will be
12   out. But we can consider that later.
13        I think there is no such obligation on your part.
14   The obligation on the part of those who don't settle is to
15   shape the case themselves.
16        MR. WEISS: Right now the settlement is not final.
17   As your Honor is aware, we have to deliver to the defendants a
18   certain percentage of the overall number of cases in order to
19   make it final. That will not be knowable for at least a
20   couple of months, probably mid-February.
21        So we have to protect our turf in the event the
22   settlement falls through and if there is going to be serious
23   hearings, such as the ones that you're suggesting --
24        THE COURT: They won't take place before it's clear
25   whether the settlement is taking hold.

26

1        MR. WEISS: That is what I wanted to make clear.
2        THE COURT: All right. So the takeover of the PSC
3    is something we don't have to address now, correct?
4        MR. WEISS: Yes.
5        THE COURT: Nor will we have to address the question
6    of who will handle discovery when all the pending cases are
7    settled, and my suggestion earlier -- I think I've
8    indicated -- is no longer on the table because there was, I
9    thought, cogent objection to it.
10        I'm sorry to keep you, but in going through the
11   papers I had a number of problems.
12        Is there a problem with Case Management Order 14?
13   Was that disposed of?
14        MS. GUSSACK: Your Honor, Case Management Order 14
15   which provides for the PSC to satisfy some other obligations
16   at the conclusion of litigation, is probably an order that
17   also can be implemented as soon as the settlement is
18   finalized.
19        THE COURT: So we'll hold that in abeyance.
20        MS. GUSSACK: Yes, your Honor.
         THE COURT: Is that appropriate?
         MR. WEISS: Yes, your Honor.
23        MR. SEEGER: Yes.
24        THE COURT: All right. We no longer need a UFCW
25   RICO statement because we have your complaint, right?

27

1        MR. CAHILL: Anthony Vale on behalf of Eli Lilly &
2    Company.
3        With respect to the RICO case statements, your
4    Honor, yes, Mr. Sobol and Mr. Dugan did file an amended
5    complaint, but we only got it on Monday and it's 200 pages
6    long, so we're simply evaluating that so as to whether we
7    would come back to your Honor and ask for more detail while
8    we have that under consideration.
9        THE COURT: Yes. I understand that and you have
10   that right.
11        There is a Higgins case. Who is here on that?
12   Anybody?
13        (No response.)
14        THE COURT: There is a problem of whether there is
15   an attempt to defeat federal jurisdiction by joining in state
16   doctors. Are there any of those issues before me now?
17        MS. GUSSACK: I believe those objections have been
18   withdrawn your Honor, but I will check.
19        THE COURT: If not, you can provide for a motion.
20        Does anybody wish to be heard?
21        MR. FIBICH: Your Honor, I would. My name is Tom.
22   Fibich. I represent Attorney General Foti of Louisiana in the
23   case by the state of Louisiana. I think that that case is
24   distinct and separate from the issues that you're dealing with
25   here with respect to the individual cases.

28

1        I am under a responsibility to report to General
2    Foti as to the progress I'm making and my only report so far
3    is that the discovery is stayed.
4        I would like for the court to consider what we need
5    to do with respect to that case and perhaps you would prefer
6    to have a separate conference on that much like you're doing
7    with the class action litigation, but that is an issue that I
8    think is separate and distinct that I would like to have the
9    court address at some time.
10        MS. GUSSACK: Your Honor, unlike the third party
11   parent cases, the state AG action has personal injury claims
12   in it, which would be susceptible to summary judgment
13   disposition.
14        While I'm happy to have a conversation with
15   Mr. Fibich anytime about his case, I don't believe that it is
16   in any way separate or distinct from the other claims that we
17   would be addressing.
18        THE COURT: We'll deal with it on the motion
19   practice. You'll have the motions and you can decide what you
20   want to do. I'm not prepared to deal with your issue today.
21        MR. FIBICH: Thank you, your Honor.
22        THE COURT: Thank you very much for coming up. I'll
23   say to you what I said to the other representatives for
24   Louisiana.
25        I hope that you can have your people in better

11/09/2005 03:01:36 PM

**EXHIBIT D**
**PAGE 7 OF 8**

29

1   condition shortly with the help of the whole country.

2         MR. FIBICH:  Thank you.

3         THE COURT:  Anybody else?

          Again, I want to thank all you distinguished counsel

for coming to Brooklyn.  Have a good journey back.  I look

6   forward to seeing you all again.

7                    ******

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25